KENNETH C. JOHNSTON
kjohnston@johnstonpratt.com
ROBERT W. GIFFORD
rgifford@johnstonpratt.com
JOHNSTON PRATT PLLC
1717 Main Street, Suite 3000
Dallas, Texas 75201
Telephone: (214) 974-8000
Facsimile: (972) 474-1750

CHRISTINE M. RISTER, ESQ. (225990)
christine@risterlaw.com
LAW OFFICE OF CHRISTINE RISTER
3021 Ridge Road, A-102
Rockwall, Texas 75032
Telephone: (469) 314-1700

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **CORPORACIÓN NACIONAL DE CONSUMIDORES Y USUARIOS DE CHILE,**<br><br>**Plaintiff,**<br>v.<br><br>**APPLE INC., a California corporation,**<br><br>**Defendant.** | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND FOR DAMAGES BASED ON:**<br>1.  **Trespass to Chattels**<br>2.  **Unjust Enrichment**<br>3.  **Fraudulent Misrepresentation/Omission**<br><br>**DEMAND FOR JURY TRIAL** |

Corporación Nacional de Consumidores y Usuarios de Chile, brings this action against Apple,

Inc., alleging as follows:

---

### NATURE OF THE ACTION

1.      Apple promised that its recent iOS 10 and iOS 11 software updates for the iPhone 6 and iPhone 7 models would improve those devices' performance. Apple also made it nearly impossible for its customers to refuse those updates. But Apple didn't tell its customers that it intentionally designed those software updates to slow the devices' processing speed to correct a battery defect. Yet Apple happily took its customers' money when the customers, dissatisfied with their now-slower devices, purchased new and more expensive iPhones. Apple finally came clean in December 2017 under public pressure, admitting its software updates slowed processor speed. Consumers around the world were forced to either purchase new phones for hundreds, if not thousands, of dollars or continue to struggle with their slowed devices.

2.      Plaintiff brings this action on behalf of all Chilean consumers who own the iPhone 6, iPhone 6s, iPhone 6 Plus, iPhone 6s Plus (collectively, the "iPhone 6"), or the iPhone 7 and iPhone 7 Plus (collectively, the "iPhone 7") (together, "Affected Phones"), whose devices were harmed by Apple's iOS software updates for versions 10.2.1, 10.3, 10.3.1, 10.3.3 (the "iOS 10 Update") and for versions 11.0.1, 11.02, 11.03, 11.1.1, 11.1.2, 11.2, and 11.2.1 (the "iOS 11 Update," and collectively, the "iOS 10 and iOS 11 Updates")—those updates were released between January 23, 2017 and December 13, 2017.

### THE PARTIES

3.      Plaintiff is a private non-profit organization with its principal place of business in Santiago, Chile. Plaintiff was founded in 1996 with the purpose to inform and educate consumers and assume their legal representation and defense. Plaintiff received its legal personality in 2000 by Decree No. 979 of the Ministry of Justice of Chile, which is governed, in part, by Law No. 19496.[1] Plaintiff

---

[1] Law No. 19496, Marzo 7, 1997, D.O., art. 54 (Chile) (hereinafter, the "Consumer Law"). The Consumer Law is titled "Que Establece Normas Sobre Protección de los Derechos de los

has represented hundreds of thousands Chilean consumers in collective- or diffuse-interest actions[2] to date.

4.      Plaintiff has standing to pursue this action on behalf of its members or constituents[3] under the three-element test enunciated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) Plaintiff's members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to Plaintiff's organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of individual members.

5.      Defendant Apple, Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business at 1 Infinite Loop, Cupertino, California.

JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over the claims asserted by Plaintiff pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff and its members are citizens or subjects of a foreign state and Defendant is a citizen of a U.S. state. The aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendant because it is incorporated in the State of California and is headquartered in Cupertino, California.

---

Consumidores," which roughly translates "Rules Regarding the Protection of Consumers' Rights". All Spanish translated with assistance of Chilean co-counsel at the Estudio Juan Agustín Figueroa Y. firm in Santiago, Chile.

[2] Chile's Consumer Law defines collective interests as the common rights of a determined or determinable series of consumers, tied to a supplier by a contractual link, and diffuse interests as those of an indeterminate group of consumers. *See* Art. 50, Consumer Law.

[3] For purposes of this complaint, we will use the term member in place of constituent or constituency, as analyzed in *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003). Citing *Doe v. Stincer*, 175 F.3d 879 (11th Cir.1999), the *Oregon Advocacy* court determined a member is the functional equivalent of constituent for purposes of associational standing under the *Hunt* test.

8.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the harm described herein occurred in this District. Additionally, Defendant's principal place of business is in this District, and Defendant conducts a large amount of its business in this District.

### INTRADISTRICT ASSIGNMENT

9.      Pursuant to Local Civil Rule 3-2(c), assignment to the San Jose Division is appropriate because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred at Defendant's headquarters, which is located in Cupertino, Santa Clara County, California.

### ASSOCIATIONAL STANDING

10.      Plaintiff brings this action on behalf its members and has standing because (1) Plaintiff's members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to Plaintiff's organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of individual members.[4]

11.      **Individual Standing.** Defendant has sold—and continues to sell—tens of millions of iPhones throughout the Americas. Plaintiff's members, Chilean consumers, are among those individuals who purchased the Affected Phones and have been affected by the harm described herein. Plaintiff's members would have standing to sue in their own right because 1) they suffered the actual injuries described below; 2) those injuries can fairly be traced to the actions of Defendant; and 3) those injuries are likely to be redressed by a favorable decision in this action. Accordingly, the first prong of the *Hunt* test is satisfied.

12.      **Interest is Germane to Plaintiff's Organizational Purpose.** Plaintiff's "Estatutos," or Articles of Incorporation, specifically charge Plaintiff "to protect, inform and educate consumers

---

[4] *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). These are commonly referred to as the three "prongs" of the *Hunt* test for associational standing.

---

and assume their representation and the defense of their rights." The Estatutos further state that Plaintiff will "[r]epresent both individual and collective and diffuse interests of the consumers before the judicial or administrative authorities, through the actions and resources that may be appropriate."

13.     Additionally, Plaintiff's organizational purpose, or "Mission," is as follows: "We are a non-profit civil society organization dedicated to the promotion and protection of the rights of consumers and users in Chile, through training, information and legal defense actions, in partnership with other social organizations and public and private entities, at national and international level."[5]

14.     Additionally, Plaintiff "seeks to be the leading civil society organization in the promotion and protection of the rights of consumers and users in Chile."[6]

15.     As a result, there are common questions of law and fact that are germane to "the to the promotion and protection of the rights of consumers and users in Chile." These include, without limitation:

    a.     Whether Plaintiff's members are entitled to injunctive relief;

    b.     Whether Defendant purposefully or knowingly designed the iOS 10 and iOS 11 Updates to slow down and otherwise negatively affect the Affected Phones' performance;

    c.     Whether Defendant intentionally "throttling" the speed of Plaintiff's members' iPhones constitutes trespass to chattel;

    d.     Whether Defendant is liable to Plaintiff's members for unjust enrichment;

    e.     Whether Defendant's failure to disclose the iOS 10 and iOS 11 Updates' decreases of iPhone processing speed while touting those Updates' benefits constitutes a fraudulent misrepresentation; and

    f.     Whether Plaintiff's members are entitled to damages, civil penalties, or punitive damages.

---

[5] About Us, *Plaintiff's Website*, http://www.conadecus.cl/conadecus/?page_id=11492 (last visited on April 10, 2018).

[6] *Id.*

16.     Accordingly, the second prong of the *Hunt* test is satisfied.

17.     ***Individual Participation Not Required.*** Plaintiff's members' claims are typical of each other. Each of Plaintiff's members suffered damages from the loss of use and value of the iPhone 6 or iPhone 7 device because of the performance slowdowns. Calculation of these damages does not require individual participation by the members because they are standard to each member and do not require individualized proof. Accordingly, the third prong of the *Hunt* test is satisfied.

18.     Alternatively, the third prong of the *Hunt* test, i.e., the prohibition against individual member participation, is viewed as prudential in nature and therefore a court has the discretion to govern and manage its docket.[7]  As discussed above, the Chilean government granted Plaintiff the legislative authority to pursue these claims on its members' behalves.  This legislative authorization allows this Court to reject this prudential element in the event any individual member participation may be required.

19.     Furthermore, adjudication of these claims through associational representation in California is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a.    Resolving this controversy through a representative action in California avoids the possibility of inconsistent or conflicting adjudications of individual claims in Chile;

    b.    This Court is in a superior position to interpret and apply California's laws, which have been held by California courts to convey rights to non-California

---

[7] *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 558, 116 S. Ct. 1529, 1537, 134 L. Ed. 2d 758 (1996). In *United Food*, the Court concluded that Article III mandates the first two *Hunt* elements, i.e., injury to an association member and germaneness of the organization's purposes to the subject matter of the litigation, but "that the associational standing test's third prong is a prudential one." *Id.* at 555. The Court continued, "[b]ut once an association has satisfied Hunt's first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more." *Id.*

citizens harmed by conduct occurring in, or emanating from, California;[8]

c.    This Court's procedural safeguards for plaintiffs are superior to those of Chilean courts. On information and belief, the source of which is Chilean co-counsel at the Estudio Juan Agustín Figueroa Y. firm in Santiago, Chile, plaintiffs pursuing analogous claims to those asserted in this complaint would not have the same access to information that will otherwise be readily available through standard pretrial discovery in this action;

d.    On information and belief, the source of which is Chilean co-counsel at the Estudio Juan Agustín Figueroa Y. firm in Santiago, Chile, Chilean consumers who "opt out" may reserve their individual claims in favor of filing an individual lawsuit in Chile; and

e.    On information and belief, the source of which is Chilean co-counsel at the Estudio Juan Agustín Figueroa Y. firm in Santiago, Chile, Chilean courts will give preclusive effect to a judgment rendered by a United States District Court because of the legal authority granted to Plaintiff by Chile's Consumer Law, Plaintiff's compliance with Chile's mandatory publication requirements, and the Chilean consumers' ability to "opt out" of this action.

## SUBSTANTIVE ALLEGATIONS

### *The Core of Apple's Business: New Smartphone Sales.*

20.    Apple generates the majority of its sales from the iPhone. Sales from new iPhones alone accounted for 62 percent of total net sales in 2017. More than 68 percent of these sales—or $96,600,000,000—occurred in the Americas alone.

21.    Journalists have recognized the iPhone's importance to Apple's business, stating that Apple's "success is derived from selling brand-new high-end smartphones consistently month after month" and describing it as "the single most important product for the company."

---

[8] *See, e.g.*, *In re iPhone 4S Consumer Litigation*, No. C12–1127 CW, 2013 WL 3829653 (N.D. Cal. July 23, 2013); *Wershba v. Apple Computer, Inc.*, 110 Cal. Rptr. 2d 145 (Cal. App. 6th Dist. 2001) (disapproved of on other grounds by *Hernandez v. Restoration Hardware, Inc.*, S233983, 2018 WL 577716 (Cal. Jan. 29, 2018)).

*Apple's iPhone 6 was Plagued with Unexpected Shutdown Issues.*

22.     Despite the iPhone's importance, Apple has struggled with problems in its flagship product.

23.     According to Apple's 2017 Form 10-K, "iPhone net sales decreased during 2016 compared to 2015. The Company believes the sales decline was due *primarily to a lower rate of iPhone upgrades during 2016* compared to 2015 . . . ."[9]

24.      Over the same time period, Apple's iPhone 6 began to suffer from their devices shutting down unexpectedly, despite displaying sufficient battery levels. Admitted defects in the iPhone 6's and iPhone 6s' batteries caused those shutdown issues.

25.     Consumers worldwide complained of the unexpected shutdown. In November 2016, a Chinese consumer association requested that Apple investigate "a considerable number" of reports by iPhone 6 and iPhone 6s users that the devices were shutting off despite displaying high battery levels and in room temperature environments.

26.     Just a few weeks later, Apple acknowledged that "a very small number of iPhone 6s devices may unexpectedly shut down" due to battery issues. It admitted, on its Chinese-language website only, that this problem had been caused by "a battery component's" unduly long exposure to "controlled ambient air" during manufacture between September and October 2015.

27.     Apple offered to replace batteries for a limited number of iPhone 6s manufactured between September and October 2015. To obtain those replacement batteries, Apple required its customers to back up their data, erase the "data and setting on their devices," bring their phones to

---

[9]     Investor        Relations,        *Apple's        Website*,        available        at
http://investor.apple.com/sec.cfm?ndq_keyword=&DocType=Annual (last visited April 10, 2018)
(emphasis added).

instore locations, and pay to repair other unrelated damage to the phones. Apple did not extend its warranty for the repaired phones.

28.     Despite Apple's claims that this battery defect affected only "a very small number" of devices, Apple employees reported to journalists that they were "seeing anywhere from 15 to 30 battery replacements every day" in late 2016—*Fortune* magazine described the iPhone 6 and iPhone 6s "battery issue" as "endemic."

29.     Not surprisingly, Apple's limited battery replacement did not resolve the unexpected shutdown problem. iPhone 6 and iPhone 6s owners continued to suffer from unexpected shutdowns, including owners who purchased devices manufactured outside of September through October 2015.

30.     On January 23, 2017, Apple released its iOS 10.2.1 software update. Apple did not immediately disclose to consumers that it intended the iOS 10.2.1 update to fix the shutdown problem. It waited until February 2017 to disclose that the update had "made improvements to reduce occurrences of unexpected shutdowns."

31.     But Apple kept hidden what exactly those "improvements" were.

**Apple Admitted its iOS 10 and iOS 11 Updates Slowed the iPhone's Processing Speed.**

32.     iPhone owners with the iOS 10 and 11 Updates repeatedly complained that the devices were running more slowly after the updates.

33.     Spurred by those complaints, in late December 2017, PrimateLabs, a company that creates software to measure computer processing speed, released the results of tests on the iPhone 6s and the iPhone 7. Those tests showed that the introduction of iOS 10.2.1 on the iPhone 6s and iOS 11.2.1 on the iPhone 7 caused those devices' processing speed to slow compared to earlier operating systems.

34.     Upon information and belief, the introduction of each iOS update after iOS 10.2.1 similarly caused the iPhone 6 and iPhone 7 to operate more slowly.

35.     In response, on December 20, 2017, Apple publicly admitted that the iOS10 and iOS11 Updates slowed down the iPhone 6 and iPhone 7, stating:

> Our goal is to deliver the best experience for customers, which includes overall performance and prolonging the life of their devices. Lithium-ion batteries become less capable of supplying peak current demands when in cold conditions, have a low battery charge or as they age over time, which can result in the device unexpectedly shutting down to protect its electronic components.
>
> Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to smooth out the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions. We've now extended that feature to iPhone 7 with iOS 11.2, and plan to add support for other products in the future.

36.     Thereafter, on December 28, 2017, Apple formally "apologized" to its customers for "the way [they] handle[d] performance for iPhones with older batteries and how [they] communicated that process." Additionally, Apple made the following admission:

> About a year ago in iOS 10.2.1, we delivered a software update that improves power management during peak workloads to avoid unexpected shutdowns on iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE. With the update, iOS dynamically manages the maximum performance of some system components when needed to prevent a shutdown. While these changes may go unnoticed, in some cases users may experience longer launch times for apps and other reductions in performance. (Emphasis added.)

37.     In short, Apple had "improved" its iPhone 6 and iPhone 7 by slowing down their processing speeds to prevent unexpected shutdowns—shutdowns caused by problems in Apple's battery.

38.     Notably, Apple also made this "improvement" to the iPhone 7 even though there had not been extensive complaints about unexpected shutdowns of the iPhone 7.

39.     Upon information and belief, replacing the battery in the iPhone 6 and iPhone 7 prevents the processing speed from slowing because the iOS 10 and iOS 11 Updates only slow processing speed when battery condition deteriorates past a certain point.

40.     Apple did not disclose that battery replacement will prevent slower processing speed until earlier this year when it announced its new battery replacement program.

41.     And, until its recent admissions, Apple had never previously disclosed that the iOS 10 Updates and iOS 11 Updates would slow down its customers' iPhones. In fact, Apple had promised the opposite.

**Apple Promised its iOS 10 and iOS 11 Updates Would Improve the User's iPhone.**

42.     A key component of the iPhone is its operating system, which Apple regularly updates.

43.     Apple represents to its customers that those updates will benefit their iPhones.

44.     Specifically, in Chile, Apple claims that because of its current iOS 11 operating "el iPhone es mejor que antes,"[10] and "[c]on iOS 11, el iPhone y el iPad son más potentes, personales e inteligentes que nunca."[11]

45.     Apple also previously claimed about the iOS 10 operating system that "[t]odo lo que te gusta es aún mejor con iOS 10, nuestro mayor lanzamiento hasta ahora."[12]

46.     Apple, incredibly, promised that "el sistema operativo móvil más avanzado del mundo"[13]—even though Apple admittedly designed iOS 10.2.1 to slow processing speeds.

47.     Apple further touted the benefits of each iteration of those operating systems.

48.     Specifically, Apple represented that:

a.      iOS 10.2.1 "incluye correcciones de errores y mejora la seguridad del iPhone . . ."[14] and also "mejora la gestión de la energía durante picos de trabajo para

---

[10] "iPhone is better than before."

[11] "With iOS 11, the iPhone and iPad are more powerful, personal and smart than ever."

[12] "Everything you like is even better with iOS 10, our biggest release so far."

[13] "The most advanced mobile operating system in the world."

[14] ". . . includes bug fixes and improves the security of the iPhone. . . ."

evitar que se apague el iPhone de forma inesperada."[15] Nowhere did Apple disclose that avoiding unexpected shutdowns required slower processors.

     b.    iOS 10.3 offered numerous "new features" and improvements to various applications.

     c.    iOS 10.3.1, 10.3.2 and 10.3.3 included "corrige algunos errores y mejora la seguridad del iPhone . . . ."[16]

     d.    iOS 11.0.1 and each of its subsequent updates similarly included numerous "correcciones de errores" and "mejoras" to various iPhone functions and features.

49.    In addition to proclaiming the software updates' benefits, Apple also made it very difficult for its customers to avoid the iOS 10 Updates and iOS 11 Updates.

50.    The iPhone 6 and iPhone 7 devices repeatedly reminded iPhone owners to update their software until the owner agreed to accept the updates.

51.    Additionally, if iPhone owners did not update, numerous applications for their devices could ultimately become unusable.

**_Plaintiff's Members Suffered Damages from the iOS 10 and iOS 11 Updates._**

52.    Plaintiff's members own or have previously owned iPhone 6s or iPhone 7s during the time Apple released the iOS 10 and iOS 11 Updates.

53.    As a result of the iOS 10 and iOS 11 Updates, Plaintiff's members' iPhones operated more slowly and their functionality was materiality impaired. The iPhones suffered problems with applications freezing, forced rebooting, and delayed response time.

---

[15] ". . . improves energy management during work peaks to prevent the iPhone from turning off unexpectedly."

[16] ". . . fixes some bugs and improves the security of the iPhone . . . ."

54.   Plaintiff's members attempted to address those problems by purchasing new iPhones, at the cost of hundreds of dollars, and by purchasing accessory equipment, such as new batteries or chargers, in an attempt to fix their devices' issues.

55.    Plaintiff's members were unaware of the slowed processing speed caused by the iOS10 and iOS 11 Updates.

56.   Had they been aware of the decreased processing speed caused by those updates, Plaintiff's members would have purchased different, non-Apple, phones, refused to accept the updates, or purchased new batteries to avoid the processing speed slowdown.

57.   Defendant's wrongful actions directly and proximately caused the loss of value to Plaintiff's members' iPhones causing them to suffer, and continue to suffer, economic damages and other harm for which they are entitled to compensation, including:

   a.   Replacement of old phone;

   b.   Loss of use;

   c.   Loss of value;

   d.   Purchase of new batteries;

   e.   Ascertainable losses in the form of deprivation of value of their iPhones; and

   f.   Overpayments to Defendant for iPhones in that a portion of the price paid for each such iPhone by Plaintiff's members to Defendant was for Defendant to purposefully not interfere with the usage of their iPhones

**CLAIMS FOR RELIEF**

**CLAIM ONE**
**Injunctive Relief**

58.   Plaintiff incorporates and reallege the substantive allegations contained in each and every paragraph of this Complaint.

59.   Defendant purposefully and knowingly modified the iOS 10 and iOS 11 updates to include performance-degrading features under the guise of preserving battery life.

---

60.     Defendant included these performance-degrading features without Plaintiff's members' knowledge or informed consent.

61.     Specifically, Defendant misrepresented and omitted facts about the iOS 10 and iOS 11 updates that were and are material to Plaintiff's members' decisions to download and install those updates.

62.     Once installed, Plaintiff's members were forced to purchase either new iPhones or new batteries to restore processing speed and functionality or continue to live with their now-unreliable devices.

63.     Defendant's unlawful acts and practices constitute electronic trespass to chattel and directly and proximately caused harm to Plaintiff's members. Specifically, Plaintiff's members have suffered harm, including loss of use and enjoyment of their iPhones due to the material impairment of its performance and functionality, loss of value, loss of use, and losses in the form of costs to upgrade or otherwise replace their iPhones.

64.     California courts have found in similar situations that this type of ongoing trespass constitutes irreparable harm adequate to support injunctive relief.[17]

65.     On March 29, 2018, Defendant released iOS 11.3, which includes an option that allows iPhone owners to disable the complained of speed throttling "performance management feature." If this Court does not grant permanent prohibitory injunctive relief requested, nothing prevents Defendant from surreptitiously reenabling this "performance management feature," and resuming its electronic trespass in the future. Accordingly, other remedies available at law, such as monetary

---

[17] *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1067 (N.D. Cal. 2000) ("The court concludes that under the circumstances present here, [Defendant's] ongoing violation of [Plaintiff's] fundamental property right to exclude others from its computer system potentially causes sufficient irreparable harm to support a preliminary injunction.").

damages, are inadequate to compensate for Plaintiff's members' injuries.

66.    The balance of hardships weighs in favor of granting a permanent injunction. Plaintiff's members have suffered irreparable harm because of Defendant's intentional and unauthorized interference. Defendant's conduct and historical business practices make clear that without a permanent injunction, there is a strong likelihood that Defendant will engage in similar conduct in the future. Therefore, it is probable that Plaintiff's members would suffer additional future hardship in the absence of the requested relief.

67.    Conversely, Defendant is unlikely to suffer any hardship—except for possible loss of sales from customers who may have otherwise been duped by Defendant's unscrupulous business practices—if this Court issued a permanent injunction.

68.    For these same reasons, the public interest would not be disserved by a permanent injunction.[18] In fact, the Court would advance the public interest by protecting the legal rights of individuals to their personal property.

69.    Defendant's past conduct presents a threat and likelihood of future harm to Plaintiff's members and consumers in Chile and around the world. Accordingly, Plaintiff seeks an injunction permanently enjoining Defendant from engaging in the same or similar unlawful acts and practices in the future.

70.    Specifically, Plaintiff requests a permanent injunction that enjoins and restrains Defendant from:

      a.    releasing software updates that electronically trespass on users' devices;

      b.    using adhesion contracts to gain permissions to electronically trespass on users' devices; and

      c.    engaging in any activity that disrupts, diminishes the quality of, interferes with

---

[18] *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 785 (N.D. Cal. 2017) ("The public has an interest in ensuring that computers are not accessed without authorization.").

the performance of, or impairs the functionality of users' devices without users' express informed consent.

### <u>Claim Two</u>
### Trespass to Chattels

71.     Plaintiff incorporates and realleges the substantive allegations contained in each and every paragraph of this Complaint.

72.     Plaintiff's members own or have previously owned one or more of the Affected Phones during the time Apple released the iOS 10 and iOS 11 Updates.

73.     Defendant intentionally interfered with Plaintiff's members' iPhones by causing Plaintiff's members to download and install performance-degrading features that were concealed within iOS 10 and iOS 11 Updates. Upon installation, the iOS 10 and iOS 11 Updates materially impaired Plaintiff's members' iPhones' performance and functionality by reducing the Affected Phones' processing speed.

74.     Importantly, Plaintiff's members never expressly or impliedly assented to Defendant interfering with their iPhones and, indeed, could not so assent, because Defendant never informed them that the iOS 10 and iOS 11 Update would decrease their iPhones' processing speed.

75.     Defendant intentionally interfered with Plaintiff's members' use and possession of their iPhones and thereby proximately caused Plaintiff's members' economic damages and other harm, in an amount to be proven at trial, including, but not limited to, loss of use and enjoyment of their iPhones due to impairment of its functionality, loss of value, loss of use, and losses in the form of costs to upgrade or otherwise replace their iPhones.

## CLAIM THREE
## Unjust Enrichment

76.     Plaintiff incorporates and realleges the substantive allegations contained in each and every paragraph of this Complaint.

77.     Defendant has received monetary benefits from Plaintiff's members in the form of payments made for the purchase of one or more Affected Phones.

78.     Because Defendant intentionally slowed and otherwise reduced the Affected Phones functionality, Plaintiff's members believed it was necessary to replace their "obsolete" Affected Phones with newer, more expensive iPhones. Plaintiff's members therefore conferred additional monetary benefit on Defendant.

79.     Defendant, through the fraudulent statements and omissions detailed above, has unlawfully received monetary and other benefits at Plaintiff's members' expenses. As a result, Defendant has been unjustly enriched by retaining the revenues from such purchases.

80.     Defendant's retention of these monetary benefits would be inequitable and unjust under the circumstances.

81.     Accordingly, Defendant should be ordered to disgorge these monetary benefits as restitution to Plaintiff's members, to the extent and in the amount deemed appropriate by the Court.

## CLAIM FOUR
## Fraudulent Misrepresentation/Omission

82.     Plaintiff incorporates and realleges the substantive allegations contained in each and every paragraph of this Complaint.

83.     Defendant knowingly made material misrepresentations about the iOS 10 and iOS 11 Updates to Plaintiff's members. The misrepresentations were made in, among other things, pervasive worldwide advertising campaigns extolling the benefits of each new iPhone and its corresponding iOS.

The misrepresentations were false because they only highlighted the positive aspects of the iOS 10 and iOS 11 Updates without also disclosing the updates' performance-degrading, negative effects.

84.   Specifically, Defendant represented that iOS 10 operating system was "el sistema operativo móvil más avanzado del mundo"[19] and that "[t]odo lo que te gusta es aún mejor con iOS 10, nuestro mayor lanzamiento hasta ahora."[20] Defendant knew, however, that the subsequent iOS 10.2.1 update would actually slow the Affected Phones' processing speed, making accessing the information you need slower than before.

85.   Defendant further represented that iOS 10.2.1 "[t]ambién mejora la gestión de la energía durante picos de trabajo para evitar que se apague el iPhone de forma inesperada,"[21] but failed to disclose the "mejora" or "improvement" was to reduce the Affected Phones' processing speed.

86.   Additionally, Defendant represented that with iOS 11, "el iPhone es mejor que antes."[22] Defendant further represented that "[c]on iOS 11, el iPhone y el iPad son más potentes, personales e inteligentes que nunca."[23] But Defendant's iOS 11 Update throttled the Affected Phones' processing power and, in turn, materially impaired Plaintiff's members Affected Phones.

87.   Furthermore, Defendant made fraudulent omissions of facts within its knowledge to the Plaintiff's members, namely that the iOS 10 and iOS 11 Updates would cause the Affected Phones to run more slowly and that the decrease in processing speed could be avoided by the purchase of a new battery (the "Concealed Facts").

---

[19] "The most advanced mobile operating system in the world."

[20] "Everything you like is even better with iOS 10, our biggest release so far."

[21] "It also improves energy management during work peaks to prevent the iPhone from turning off unexpectedly."

[22] "iPhone is better than before."

[23] "With iOS 11, the iPhone and iPad are more powerful, personal and smart than ever."

88.     Specifically, Defendant has since admitted that the iOS 10 and iOS 11 Updates deteriorated the performance of the Affect Phones by causing:

       a.      Longer app launch times;

       b.      Lower frame rates while scrolling;

       c.      Backlight dimming;

       d.      Lower speaker volume;

       e.      Gradual frame rate reductions in some apps;

       f.      Disabling the camera flash; and

       g.      Apps refreshing in background may require reloading upon launch.

89.     The Concealed Facts were material because the decrease in processing speed significantly impacted the functionality of Plaintiff's members' iPhones.

90.     By its misrepresentations and omissions, Defendant, upon information and belief, intended to induce Plaintiff's members to purchase newer iPhone models to increase profits and improve Defendant's business as a whole.

91.     Plaintiff's members justifiably relied on Defendant's material misrepresentations and omissions in downloading and installing the iOS 10 and iOS 11 Updates.

92.     Plaintiff's members suffered damages, in an amount to be proven at trial, as a result of acting without that knowledge. Specifically, Plaintiff's members unnecessarily purchased newer iPhone models, purchased other Apple accessories in an attempt to restore processing speed, or suffered unnecessarily prolonged loss of their devices' loss of use and function which could have been remedied by the purchase of a new battery.

93.     Plaintiff's members' reliance on Defendant's representations and omissions was a substantial factor in causing Plaintiff's members' harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.    For a permanent injunction enjoining and restraining Defendant from releasing software updates that electronically trespass on users' devices;

B.    For a permanent injunction enjoining and restraining Defendant from using adhesion contracts to gain permissions to electronically trespass on users' devices;

C.    For a permanent injunction enjoining and restraining Defendant from engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of users' devices without users' express informed consent;

D.    For an award of actual damages and compensatory damages, in an amount to be determined by this Court;

E.    For an award of costs of suit, pre- and post-judgment interest, and attorneys' fees, as allowable by law; and

F.    Such other and further relief as this Court may deem just and proper.

Dated: April 27, 2018.                    Respectfully submitted,

                                          **LAW OFFICE OF CHRISTINE RISTER**

                                          By: _/s/ Christine M. Rister_____
                                              **Christine M. Rister, Esq.**

                                          **JOHNSTON PRATT PLLC**

Of counsel                                **Kenneth C. Johnston**
*Pro hac vice* forthcoming.               Texas Bar No. 00792608
                                          kjohnston@johnstonpratt.com
                                          **Robert W. Gifford**
                                          Texas Bar No. 24093543
                                          rgifford@johnstonpratt.com
                                          1717 Main Street, Suite 3000
                                          Dallas, Texas 75201
                                          Telephone: (214) 974-8000
                                          Facsimile: (972) 474-1750
                                          ***Attorneys for Plaintiff***[24]

---

[24] As referenced herein, Chilean co-counsel has advised the undersigned counsel on matters of Chilean law. Plaintiff plans to seek limited *pro hac vice* admission for Chilean co-counsel to assist in addressing

### DEMAND FOR JURY TRIAL

Based on the foregoing, Plaintiff hereby demands a jury trial for all claims so triable.

Dated: April 27, 2018.                    Respectfully submitted,

**LAW OFFICE OF CHRISTINE RISTER**

By: */s/ Christine M. Rister*
    **Christine M. Rister, Esq.**

**JOHNSTON PRATT PLLC**

Of counsel                    **Kenneth C. Johnston**
*Pro hac vice* forthcoming.              Texas Bar No. 00792608
    kjohnston@johnstonpratt.com
    **Robert W. Gifford**
    Texas Bar No. 24093543
    rgifford@johnstonpratt.com
    1717 Main Street, Suite 3000
    Dallas, Texas 75201
    Telephone: (214) 974-8000
    Facsimile: (972) 474-1750
    ***Attorneys for Plaintiff***[25]

---

those matters insofar as they are disputed or of interest to the Court. *See, e.g., Agjunction, LLC v. Agrain, Inc.*, No. 14-2069-JAR, 2014 WL 1745498, *passim* (D. Kan. May 1, 2014) (admitting foreign attorneys *pro hac vice* for limited purposes where the Court anticipated considering issues of foreign law). Chilean co-counsel consists of José Ignacio Figueroa Elgueta of the Estudio Juan Agustín Figueroa Y. firm in Santiago, Chile.

[25] *Id.*

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**                    **PAGE 21**
**45520v3**